*471
 
 Weygandt, C. J.
 

 A study and restudy of the maze of legislation involved in this controversy lead to further wonderment at the remarkable moderation of statement on the part of the Court of Appeals in the following pertinent comment in its extended and exhaustive opinion:
 

 “During the period encompassed by the transactions involved in this case there have been enacted at least seventeen separate and distinct bills which affect the questions here presented. The issues are almost impossible of solution because of the changing method of and controlling authority for distributing poor relief, the mass and prolixity of legislation affecting the collection, disbursement and ultimate disposition of the funds raised by bond issues and from excise tax.”
 

 In reviewing and affirming this judgment this court is satisfied to limit its observations to a precis of the correct reasoning and conclusion of the Court of Appeals.
 

 Briefly, the enactment of the series of statutes here involved began in the year 1932. The purpose was to provide funds for poor relief throughout the state of Ohio. Amended Senate Bill No. 4 (114 Ohio Laws, part 2, page 17) was passed March 31, 1932. House Bill No. 501 (116 Ohio Laws, page 571) was passed May 23, 1935. Each of these acts authorized the counties to issue bonds, the proceeds of which were to.be used for poor relief. Furthermore, each of these statutes provided for the levy of certain public utility excise taxes, the proceeds of which were to be distributed by the state to the counties for the primary purpose of meeting the interest and principal of these bonds. The sum realized by Franklin county under the provisions of Amended Senate Bill No. 4 proved insufficient to discharge the obligations thus incurred. However, under House Bill No. 501 the tax proceeds received by Franklin county from the state were sufficient not only to retire the bonds but to produce a
 
 *472
 
 surplus of $214,403,98 in the hands of the county treasurer by the close of the year 1940. It is this sum of money that constitutes the bone of contention between the county and the city of Columbus.
 

 During the period of time here involved the county issued bonds in the total sum of $1,550,600 under the authority conferred by this legislation. The city makes no complaint that it was not allocated and paid its full share of the receipts realized from the sale of these bonds in proportion to the amounts needed for poor relief by the various local subdivisions within the county. But the city insists and the county denies that during this period the city was a “local relief area” and -therefore entitled to its proportionate share in any tax proceeds received by the county in excess of the amount required for retiring its bonds. It is significant that the term “local relief area” does not appear in any of this legislation until the passage of House Bill No. 675 (118 Ohio Laws, 710), now Section 3391
 
 et seq.,
 
 General Code, which did not become effective until June 6,1939; and likewise, this is the first in this series of legislative enactments on this specific subject to mention distribution of any surplus to municipalities. Section 3391-2, General Code, a part of this act, reads in part as follows:
 

 “The moneys received by a county under any law other than this act providing for the distribution of state funds to counties for poor relief shall be paid into the county -treasury to the credit of the proper funds therein; but in counties containing two or more local relief areas, or part or parts thereof, the proportional share of the county relief area as determined by the provisions of this act shall be paid into the treasury of the county relief area, and the proportional shares of the cities shall be distributed and paid by the county treasurer on the order of the county auditor to the treasurer of each city entitled thereto. Such distribution shall be made in proportion to the obligations in
 
 *473
 
 curred for poor relief in the respective local relief .areas, and part or parts thereof in the county, during the calendar month next preceding the receipt of such moneys. ’ ’
 

 In view of this first clear legislation on this specific subject, the Court of Appeals was correct in holding that the city was entitled to its proportionate share of the surplus that accumulated after the effective date of the act but not prior thereto. There is nothing in the provisions of the statute to indicate an attempt to make it retroactive. The amount of the surplus or excess that accumulated after the effective date of June 6, 1939, was found to be $59,077.57. The city’s proportionate share thereof was fixed at 80.79 per cent, amounting to $47,728.77. This determination was not erroneous.
 

 Judgment affirmed.
 

 Turner, Williams, Matthias, Hart and Zimmerman, JJ., concur.
 

 Bettman, J., not participating.